Dale S. Zeitlin (#006615)
ZEITLIN & ZEITLIN, P.C.
5050 North 40th Street, Suite 330
Phoenix, AZ 85018
Telephone (602) 648-5222
Facsimile (602) 648-5226
Email: dale@zeitlinlaw.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HAM KNEE, LLC, an Arizona limited liability company | Case No. |
| Plaintiff, | **COMPLAINT** |
| | **AND** |
| vs. | **DEMAND FOR JURY TRIAL** |
| TRAK SURGICAL, INC., a Delaware corporation | |
| Defendants. | |

**BREACH OF CONTRACT**

**General Allegations**

1.    Ham Knee, L.L.C. ("HAM"), is an Arizona limited liability company, and is a citizen of the State of Arizona.

2.    Trak Surgical, Inc. ("Trak") is incorporated in Delaware and is a Delaware citizen.

3.    HAM has been damaged in excess of $600,000.

4.      There is complete diversity of citizenship and the amount in controversy exceeds $75,000. This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1332 and 2201. This Court also has jurisdiction because this complaint alleges violations of the federal securities laws.

5.      Venue is proper in this court pursuant to 28 U.S.C. § 1391.

6.      Bruce Lichorowic was formally Trak's CEO. As such, Trak is responsible for his actions under the doctrine of respondeat superior.

7.      Trak solicited HAM's business and induced HAM to enter into three separate contracts with Trak. Mr. Lichorowic, on Trak's behalf, travelled to Phoenix, Arizona and met with two of the members of HAM in Phoenix on at least two separate occasions. Mr. Lichorowic solicited HAM's investment into Trak. The result of those meetings in Phoenix was HAM's decision to invest in Trak. Trak sent HAM two agreements: the convertible note and warrant purchase agreements (the "Convertible Note Agreements"). HAM executed the Convertible Note Agreements in Phoenix, Arizona.

8.      Trak, by and through Mr. Lichorowic, made numerous misrepresentations regarding Trak, including the following: that the engineering work being done in Trak's San Jose office was ahead of schedule and the product would be ready for FDA submission no later than February 2014, that the San Jose office and the lab in Nebraska were working in harmony toward the commercialization of the product; and that a major pharmaceutical company (J&J) had agreed in principle to make a substantial investment in Trak.

9.      These representations were false. In fact, the lab in Nebraska, run by Dr. Haider, and the San Jose office, were in open conflict with one another. Dr. Hani Haider hated the San

Jose team and wanted to fire them. Dr. Haider hated Mr. Lichorowic and would not work with him. The product was nowhere near ready for FDA submission, as Dr. Haider later admitted. And, there had been very preliminary discussions with J&J but nothing even close to an agreement in principle.

10.    Dr. Hani Haider is a shareholder in Trak and interim chief executive officer. At all times, he acted as Trak's agent. As such Trak is responsible for Dr. Haider's conduct under the doctrine of respondeat superior.  Dr. Haider also travelled to Phoenix, Arizona to report on the condition of Trak, and to attempt to convince HAM not to sue Trak for securities fraud and mismanagement of Trak. Dr. Haider told HAM that Mr. Lichorowic was incompetent, untrustworthy, and had been wasting Trak's financial resources. The result of this meeting in Phoenix and follow up telephone conversations was the parties' agreement to a third contract, initially evidenced by a term sheet (the "Term Sheet"), and later by the Stock Purchase Agreement and related documents (collectively the "SPA"). Trak and HAM entered into the Term Sheet on or about June 20, 2014.

11.    HAM signed the SPA and repeatedly requested that Trak sign it as well. Trak, however, refused to sign the SPA, and has now repudiated it and the Term Sheet.


**COUNT I**

Breach of the Convertible Note Agreements

12.    The plaintiff incorporates by this reference the averments set forth above.

3

13.     Section 8.15 of the Convertible Note Agreements requires Trak to provide HAM with "further assurances" including information of the financial and business conditions and prospects of Trak.

14.     HAM has repeatedly requested financial and business conditions, and prospects from Trak. But Trak has refused to provide any information whatsoever.

15.     Trak has breached Section 8.15 of the Convertible Note Agreements.

Wherefore, HAM prays for the following relief:

A.      For an order requiring Trak to provide all documents regarding the terms of any investors/investments in Trak;

B.      For an order requiring Trak to provide the financial and business conditions of Trak;

C.      For its attorney's fees and costs incurred herein; and

D.      For such other and further relief as the Court seems just.


## COUNT II: Breach of Contract: The Term Sheet

16.     The plaintiff incorporates by this reference the averments set forth above.

17.     Dr. Haider, on behalf of Trak put the company in peril. Dr. Haider, proved that he was unable to work with the prior CEO, Mr. Bruce Lichorowic, and, in a secretive meeting between Dr. Haider and Steve Hutchinson, hatched a plan to stack the board of directors so that the Mr. Lichorowic would be fired. This was done at a most inopportune time, as Mr. Lichorowic was scheduled to come to Phoenix, Arizona to raise needed additional capital to fund Trak.

4

18.     With utter disregard for Trak's already perilous financial situation, Dr. Haider along with his brother-in-law, Ibrahim Al-Shawi, and Mr. Hutchinson removed Mr. Lichorowic as CEO, thereby immediately putting the company in a critical financial crisis. Dr. Haider agreed to pay Mr. Hutchinson fees out of Trak's coffers, and then Dr. Haider and Mr. Hutchinson hired as CEO, Mr. Hutchinson's business cohort, Jeffrey Vaske, who had no prior experience in this technological field. Mr. Vaske, too, was paid handsomely for his services (which, as Dr. Haider has acknowledged were a complete waste of time). Mr. Vaske was far out of his league and inappropriate for the CEO position.

19.     At Dr. Haider's insistence, Trak squandered additional monies when it could ill afford to do so. Further, Mr. Vaske quickly learned, just as Mr. Lichorowic had found, that Dr. Haider continually placed roadblocks to the commercialization of Trak's products.   These continual problems lead to the resignation of all of the members of the board, save Dr. Haider. Dr. Haider appointed himself CEO.

20.     After the board resigned and recognizing that Trak was in dire financial straits, the convertible note holders and Dr. Haider entered into the Term Sheet. The Term Sheet was extraordinarily detailed laying out every substantive term between the parties.

21.     After the Term Sheet was executed, Trak's attorneys prepared the SPA. All of the terms were agreed to.

22.     The convertible note holders immediately raised financial commitments of $550,000 from both current investors and new investors. However, this additional money was only available if Trak executed the SPA.

23.    In addition to raising additional money, the convertible note holders immediately sought out a person with established business acumen in this particular technological space to run Trak. Richard Grant agreed to become the CEO of the company, but only after Trak signed the SPA.  Nevertheless, in good faith, Mr. Grant began immediately working on behalf of Trak. Mr. Grant flew to the San Jose office and had extensive meetings with the San Jose team. The result of Mr. Grant's meetings was that Mr. Grant learned that the San Jose team—just as Mr. Vaske had before him and Mr. Lichorowic had before Mr. Vaske— was crucial to the success of Trak. Mr. Grant reported that the employees in San Jose were hardworking and committed to seeing the success of Trak.

24.    Because Dr. Haider's conduct had rendered Trak nearly insolvent, it became imperative that Dr. Haider sign the SPA. Therefore, the convertible note holders requested that Dr. Haider sign the SPA no later than, Friday, July 11, 2014. But, Dr. Haider refused to execute the SPA on behalf of Trak.

25.    Dr. Haider, on behalf of Trak, has violated the agreement to negotiate in good faith and fair dealing under the Term Sheet. The Term Sheet goes far beyond Trak's obligation to negotiate in good faith: "**The Company agreed to close the transaction expeditiously.**" Trak, though refused to sign the SPA. Trak is in breach of this very clear obligation.

26.    In refusing to execute the SPA, Trak has breached the parties' contract.

27.    Instead of closing the transaction expeditiously, Trak has purposely stalled the closing of the SPA while Dr. Haider has tried to better his personal financial situation.

28.    Contrary to the best interests of Trak, Dr. Haider fired all of the San Jose team and closed the office. This action constitutes bad faith and a repudiation of the Term Sheet and

the SPA, as the convertible note holders and other stock holders had repeatedly informed Trak that the San Jose team was essential to the success of Trak.

29.     Trak's bad faith conduct and breach of the Term Sheet has put Trak in an insolvent position. Trak's conduct may result in the loss of the University of Nebraska license.

Wherefore, the plaintiff prays for the following relief:

A.     For damages in excess of the jurisdictional limit;

B.     For pre-judgment and post-judgment interest;

C.     Alternatively for specific performance;

D.     For attorney's fees and expert fees incurred herein;

E.     For costs; and

F.     For such other and further relief as the Court deems just.

## COUNT III: Securities Fraud

30.     HAM incorporates by this reference the averments set forth above.

31.     Trak sold the convertible notes to HAM, which are securities under § 10(b) – 5 of the Securities Exchange Act of 1934.

32.     HAM purchased the securities in reliance upon material misrepresentations or omissions made by Trak regarding the (1) the timing of the product's submittal to FDA for approval (it was nowhere near submitting); that the Nebraska lab and the San Jose team were working together (they were not); and that J&J had agreed in principle to make a major investment in Trak (it had not). HAM was not aware and Trak purposely concealed that Dr. Haider and Mr. Lichorowic hated each other and had completely stopped working together.

Trak had a duty to inform HAM of the animosity and complete distrust between Dr. Haider and Mr. Lichorowic and the resulting dysfunction in operating Trak.

33.     Trak knew these representations and omissions were false, Trak intended for HAM to rely on these representations and omissions. HAM did in fact reasonably rely on these misrepresentations and omissions, and has suffered damages as a result.

34.     Trak made these material misrepresentations and omissions for its financial gain; Trak acted with intent to defraud and with malice.

Wherefore, the plaintiff prays for the following relief:

A.     For damages in excess of the jurisdictional limit;

B.     For pre-judgment and post-judgment interest;

C.     For attorney's fees and expert fees incurred herein;

D.     For costs; and

E.     For such other and further relief as the Court deems just.


**COUNT IV Common Law Fraud**

35.     The plaintiff incorporates by this reference the averments set forth above.

36.     Trak's actions set forth above constitute common law fraud. Trak falsely represented or omitted facts that it had a duty to disclose; Trak knew or believed that the representations were false or made the representations and concealed facts with a reckless, indifference to the truth; Trak intended that HAM invest in Trak;  HAM  justifiably relied on the representations and omissions; and HAM invested in Trak in reliance on the material

misrepresentations and omissions made by Trak, and has suffered damages as a result of its reliance.

Wherefore, the plaintiff prays for the following relief:

A.      For damages in excess of the jurisdictional limit;

B.      For pre-judgment and post-judgment interest;

C.      For attorney's fees and expert fees incurred herein;

D.      For costs; and

E.      For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED this 6th day of August, 2014.

                              ZEITLIN & ZEITLIN, P.C.

                              BY:  /s/ Dale S. Zeitlin
                                   Dale S. Zeitlin, Esq.
                                   5050 North 40th Street, Suite 330
                                   Phoenix, Arizona  85018
                                   *Attorney for Plaintiff*


                         **DEMAND FOR JURY TRIAL**

The plaintiff hereby demands a jury trial.

RESPECTFULLY SUBMITTED this 6th day of August, 2014.

                              ZEITLIN & ZEITLIN, P.C.

                              BY:  /s/ Dale S. Zeitlin
                                   Dale S. Zeitlin, Esq.
                                   5050 North 40th Street, Suite 330
                                   Phoenix, Arizona  85018
                                   *Attorney for Plaintiff*